## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| **In Re:**<br><br>**Wayne Glenn Holland and Misty Jo Holland,**<br><br>**Debtors.** | **Bankruptcy Case No. 18-40986-JMM** |

## MEMORANDUM OF DECISION

**Appearances:**

Robert J. Maynes, MAYNES TAGGART, PLLC, Idaho Falls, Idaho, Attorney for Debtor.

Gregory L. Crockett, HOPKINS RODEN CROCKETT HANSEN & HOOPES, PLLC, Idaho Falls, Idaho, Attorney for creditor Bank of Idaho.

Gary L. Rainsdon, Twin Falls, Idaho, Chapter 7 Trustee.

William M. Humphries, Assistant United States Attorney, Boise, Idaho, Attorney for creditor Farm Service Agency.

### *Introduction and Procedural History*

On October 27, 2018, debtors Wayne Glenn Holland and Misty Jo Holland

("Debtors") filed a chapter 12[1] petition.  Dkt. No. 1.  On March 22, 2019, they filed an

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM OF DECISION – 1

amended chapter 12 plan, Ex. 100 (the "Plan").  A supplement to the Plan was filed on

April 3, 2019.  Dkt. No. 94.  Objections to the Plan as proposed were filed, Dkt. Nos. 97,

107, and 116, and stipulations were subsequently entered which modified the Plan,

resolving the objections of creditors Diversified and Farm Service Agency, Dkt. Nos.

126, 129.  Only the objections of creditor Bank of Idaho ("BOI") remain.  The Plan then

came before the Court on confirmation.

After conducting an evidentiary hearing regarding confirmation on April 23,

2019.  Dkt. No. 133.  Post-hearing briefing was submitted, Dkt. Nos. 138, 141, and the

matter was thereafter deemed under advisement.

After considering the briefing, exhibits, and testimony presented, as well as the

applicable law, the Court hereby resolves the issues surrounding confirmation.  Fed. R.

Bankr. P. 7052; 9014.

### *Facts*

In 2012, Debtors purchased a ranch located near Malta, Idaho.  It consists of 1,600

deeded acres and 2,800 acres leased from the State of Idaho ("Malta Ranch").  There are

numerous springs on the property, and part of the acreage is irrigated such that Debtors

can raise cattle during the winter and can grow hay.  The Malta Ranch also includes a

990-head certified feedlot.  Debtors purchased the Malta Ranch for $1,190,000, financed

by BOI.  Dkt. No. 23, Schedule D; Claim Reg. 2-1, Part 9.  Debtors and representatives

of BOI testified that the collateral for the loan was the Malta Ranch, cross-collateralized

MEMORANDUM OF DECISION − 2

with livestock, hay, fixtures, irrigation equipment, accounts receivable, inventory, government payments and programs, and equipment ("Personal Property Collateral").

Later, in 2017, Debtors obtained a Farm Service Agency ("FSA") loan in the amount of $300,000 ("FSA Loan"). Ex. 111. To secure the FSA Loan, they executed a promissory note in favor of FSA which required annual payments in the amount of $24,904; the full amount was due seven years from the date of the note. Ex. 116. The FSA Loan was secured by the Malta Ranch along with certain water rights and irrigation equipment. *Id*. FSA also executed a loan guarantee in favor of BOI. *Id.* at ¶ 2. By this instrument, FSA guaranteed up to ninety percent of the debt on the Malta Ranch. *Id*. This guarantee was later sold to Farmer Mac.

In 2015 Debtors purchased a second ranch, near Montpelier, Idaho, for $1,700,000 ("Montpelier Ranch"). Debtors borrowed an additional $150,000 to make improvements, and thus the principal loan amount was $1,850,000. The Montpelier Ranch consists of 2,610 deeded acres, plus 1,280 acres leased from the State of Idaho and 800 acres leased from the Bureau of Land Management. Exs. 112, 113. The leases are 20-year leases, and that leased property is "checkerboarded" in with the deeded acres, meaning there are private pieces surrounded by leased ground. As such, it is understood that the leased parcels and the deeded land need to stay together with the same owner/lessee. Upon purchasing the Montpelier Ranch, Debtors renovated the home, which was uninhabitable at purchase, and fixed the fencing, added corrals, troughs, an irrigation pivot, and 7,500 feet of irrigation water mainline.

MEMORANDUM OF DECISION − 3

Debtors testified the Montpelier Ranch has several hundred acres of flood-irrigated meadow, seventy-seven acres of land irrigated by the pivot they installed, and several hundred additional acres that are irrigated using ditches. The water gravity feeds from a reservoir above the ranch into the pivot when the water is high; otherwise they pump water to the pivot. The remainder of the ditches and flood irrigation is exclusively gravity fed. Debtors own eighty-five percent of the water from the reservoir, and all parties agree that there is more than enough water available to sustain the ranching activities, which include growing hay, barley, and alfalfa on some of the land. Debtors testified they could grow crops on more of the acreage, but because they raise beef cattle, they prefer to use much of the ground for pastureland.

The Montpelier Ranch principal loan amount was $1,850,000. The purchase was 100% financed, and therefore BOI collaterized the loan with both the Malta and Montpelier Ranches, along with the Personal Property Collateral, in order to use the equity in the Malta Ranch to get the loan to value. David Moe, a senior credit officer at BOI, testified that BOI typically will only finance sixty-five percent of an agricultural loan with regard to the value of the property, and thus it needed to include the Malta Ranch in the collateral.

Debtors obtained a line of credit from BOI to purchase the Montpelier Ranch. Their plan was to ultimately roll the line of credit into their existing long-term real estate loan which they had used to purchase the Malta Ranch. But the cattle market declined somewhat during this time, and BOI decided not to merge the line of credit into the

MEMORANDUM OF DECISION − 4

existing real estate loans.  Thus, the line of credit needed to be paid down by a date

certain, and Debtors understood they would not be able to come up with the necessary

funds.  BOI gave them an extension, but all parties agreed that Debtors needed to sell one

of the ranches.

Debtors put both the Malta and Montpelier Ranches on the market, initially with

their own realtor, and later with one suggested by BOI.  The Montpelier Ranch was listed

for sale from January 2017 to January 31, 2018.  In the Fall of 2017 their realtor asked if

they would accept $3,000,000, but it was unclear if there was even a buyer.  Debtors

counteroffered for $3,650,000, which was the appraised value at the time, but their

counteroffer was rejected.  The listings have now expired.  Debtors also explored short-

term, high interest financing, but never heard back after submitting their application

documents.  Ultimately, they opted for the bankruptcy filing in an attempt to preserve

their ranch.

As of April 1, 2019, BOI estimates Debtors' indebtedness to it as $3,875,612.86,

which is the sum of the principal balance of $3,667,156.45 plus accrued interest in the

amount of $208,456.41, with interest continuing to accrue at the rate of $574.74 per day.

Dkt. No. 138.  Debtors similarly estimate BOI's allowed secured claim as totaling

$3,911,383.87.  Dkt. No. 141.

### *The Proposed Chapter 12 Plan*

In general terms, Debtors' Plan proposes to pay creditors as follows:  first, Debtors

will transfer the Montpelier Ranch to BOI in full satisfaction of its allowed secured

MEMORANDUM OF DECISION − 5

claim, colloquially known as "dirt for debt," and will then operate using only the Malta Ranch as their base.[2]  BOI's liens on the Malta Ranch and the Personal Property Collateral would be extinguished.  Next, Debtors would reduce the size of their herd by more than half down to a base herd of 215 cows.[3]  They would use the proceeds to meet the tax obligations from the transfer of the Montpelier Ranch to BOI, as well as to pay the first set of annual payments to other creditors.  Finally, Debtors would use the proceeds from the yearly sale of calves and cull cows to fund annual payments to the remaining creditors.  The final amendment to the Plan provides that the surrender of the Montpelier Ranch to BOI satisfies all debt owed to BOI in full and as such, BOI may not seek any payment from FSA under the loan guarantee.  The Plan amendment also contains the agreed amount of FSA's allowed secured claim on the promissory note, as well as the terms of payment of the loan under the Plan.

BOI objects to its treatment under Debtors' Plan.

### *Analysis and Disposition*

In order for a chapter 12 plan to be confirmed, it must meet all the requirements listed in § 1225.  The creditors apparently agree that the bulk of those requirements have

---

[2] Debtors' proposed budget is conservative, providing for an $11,000 annual cushion and not including any extra funds Mr. Holland earns by driving a truck, or any USDA payments.

[3] The Malta Ranch cannot accommodate as many head of cattle as Debtors currently have.

MEMORANDUM OF DECISION – 6

been met, as all other creditors and the trustee[4] have accepted the Plan as proposed.  The

crux of BOI's objection is that § 1225(a)(5) has not been met.  It is correct.

Section 1225(a)(5) requires, with respect to each allowed secured claim provided

for by the plan, that

> (A) the holder of such claim has accepted the plan;
> (B)
>> (i) the plan provides that the holder of such claim retain the lien securing
>> such claim; and
>> (ii) the value, as of the effective date of the plan, of property to be
>> distributed by the trustee or the debtor under the plan on account of such
>> claim is not less than the allowed amount of such claim; or
> (C) the debtor surrenders the property securing such claim to such holder.

Thus, "to be confirmed, a chapter 12 plan must either be accepted by a secured

creditor, the creditor must retain its lien and the value of its allowed secured claim must

be paid to the creditor in deferred payments, or the debtor must relinquish possession and

control of the collateral to the creditor so it may enforce its security interest under

applicable law." *In re Gray-Bailey*, 427 B.R. 536, 540 (Bankr. D. Idaho 2010).  Because

BOI has not accepted Debtors' Plan as proposed, the Court considers confirmation under

subparagraphs (B) or (C).  The Court will begin with (C).

A.  § 1225(a)(5)(C)

Considering surrender under § 1225(a)(5)(C), this Court has stated: "[w]hen a

debtor elects to surrender the collateral under (C), the secured creditor takes possession of

---

[4] The chapter 12 trustee appointed in this case is Gary L. Rainsdon.

MEMORANDUM OF DECISION – 7

the property and sells it in accordance with non-bankruptcy law." *Gray-Bailey*, 427 B.R. at 539 (quoting *First Brandon Nat. Bank v. Kerwin (In re Kerwin)*, 996 F.2d 552, 556 (2d Cir. 1993) (citing 8 Collier on Bankruptcy, ¶ 1225.03[5], at 1225–25 (rev. 15th ed. 2005))).

While surrender appears to be what Debtors are attempting to do here, the Court finds their approach does not conform with the plain text of the statute. Section 1225(a)(5)(C) permits a debtor to "surrender[] *the* property securing such claim to such holder," implying that *all* collateral must be turned over. (emphasis added). It does not permit a debtor to surrender *some* property securing the claim. Thus, for Debtors to surrender the Montpelier Ranch under (C), it must also surrender the Malta Ranch as well as the Personal Property Collateral. Other courts agree. *See First Brandon Nat. Bank v. Kerwin-White*, 109 B.R. 626, 630 (D. Vt. 1990) ("The plain language of [§ 1225(a)(5)(C)] compels the debtor to surrender the entire collateral to the creditor because the entire collateral and nothing less is the property which secures the claim."); *In re Townsend,* 90 B.R. 498, 502 (Bankr. M.D. Fla. 1988) (plan may be confirmed under § 1225(a)(5)(C) only if *all* the property securing the claim is surrendered to the creditor). In this way, creditors are protected. If the debtor surrenders the entire collateral to satisfy the debt, a creditor cannot be heard to complain that the security they bargained for is not greater than the value of the collateral. On the other hand, because the statute contemplates the creditor liquidating the collateral, if a debtor surrenders less than all the collateral in satisfaction of the debt and is not permitted to retain its lien, the creditor may

MEMORANDUM OF DECISION − 8

realize less than the full amount of the allowed secured claim.  Accordingly, because

Debtors do not propose the surrender of all of BOI's collateral, the Court concludes their

Plan is not confirmable under § 1225(a)(5)(C).

Instead, if a debtor wishes to surrender less than all of the collateral to an objecting

creditor in full satisfaction of that creditor's allowed secured claim, the debtor should

seek confirmation of the plan under § 1225(a)(5)(B)'s "cramdown" provision.

B.  § 1225(a)(5)(B)

This Code provision has two requirements: first, that the plan provide that the

holder of the allowed secured claim retain the lien securing such claim; and second that

the value, as of the effective date of the plan, of property to be distributed by the debtors

under the plan on account of such claim is not less than the allowed amount of such

claim.  The Court will discuss each of these requirements.

1. *Lien Retention Under (B)(i)*

BOI argues that the Code requires retention of "the" lien, not retention of "a" lien,

and that this requirement has been strictly construed by the courts.  The Plan proposes to

modify BOI's liens and eliminate its cross-collateralization.  Recall, BOI has a perfected

security interest in the Montpelier and Malta Ranches, as well as the Personal Property

Collateral.  Because the Plan does not surrender all the collateralized property, BOI

argues it should be allowed to retain its lien on all its security.  On the other hand,

Debtors contend that, once the Montpelier Ranch is transferred to BOI, all of the bank's

liens on Debtors' property will be extinguished because its debt will be satisfied.

MEMORANDUM OF DECISION − 9

### a.  Second Circuit Approach

While liens are generally intended to secure repayment, at least one circuit has held that the lien retention requirement in §1225(a)(5)(B) is intended only to secure the distribution of the property under the plan.  In *In re Kerwin,* decided by the Second Circuit, the debtor's proposed plan sought to transfer 125.06 acres of her 135-acre farm to the bank in satisfaction of the indebtedness.  996 F.2d at 556.  After a number of appeals, remands, and revisions, the district court ultimately held that the farmland had been properly valued, the bank's debt would be fully satisfied with the transfer, and that its lien did not need to continue on the debtor's remaining farmland to meet the requirements of §1225(a)(5)(B)(i).  The bank appealed.

In deciding the appeal, the Second Circuit considered the following issue of first impression:

> Whether a family farmer has a right in a Chapter 12 bankruptcy plan to satisfy fully an oversecured creditor by transferring a portion of the creditor's collateral determined to be equal in value to the outstanding debt; or whether the creditor is entitled to a transfer of all its collateral, and, if not, to have its security interest remain as a lien on the collateral the debtor retains, to secure against a deficiency when the creditor sells the property previously transferred to it.

*Id*. at 554.  Following its analysis, the panel affirmed the district court, holding:

> because the completed transfer of property valued at or above the secured lender's claim fully satisfied that debt—regardless of whether the property transferred comprised only part and not all of the collateral—the lien requirement of § 1225(a)(5)(B)(i) must be deemed satisfied.  This follows because however much protection a lien is entitled to under § 1225(a)(5), it does not continue in existence after the creditor's oversecured claim is satisfied by the transfer of property to it of equal or greater value.  In short,

MEMORANDUM OF DECISION − 10

> when the claim is satisfied the lien securing it is extinguished too, for
> nothing remains for it to secure.

*Id.*

The bank in *In re Kerwin* contended that under the Code, it should receive all of

the property securing its lien, or it should retain its lien, and that to hold otherwise would

force the bank into the land speculation business.  Those arguments are not dissimilar to

what BOI argues here.  To this end, the Second Circuit observed:

> Following a [§ 1225(a)(5)(B)] distribution, the bankruptcy court ceases to
> be concerned with whether the transferred property is held or sold or what
> amount such sale brings.  Although (B)(i) provides in those circumstances
> that a lien be maintained on the collateral, the lien does not guarantee what
> price the transferred property will bring upon ultimate sale. The (B)(i) lien
> only guarantees that the transfer is completed in accordance with the
> reorganization plan. A (B) distribution—quite distinct from a (C)
> surrender—provides that so long as the plan is carried out as approved, a
> creditor may not assert any deficiencies that may result when it sells the
> distributed property, nor need the creditor return any surplus.

*Id.* at 557.  In other words, the lien retention provision serves only as a protection for the

secured creditor to ensure the debtor follows through and distributes the property through

the plan as promised.  The creditor is guaranteed the value through the valuation process

as of the effective date of the plan.  In the view of the Second Circuit, because the lien

retention serves as incentive to the debtor to compel full distribution of the property as

contemplated by the plan, once such distribution has been performed, the function of the

lien ceases to exist; the purpose of the lien is satisfied and the lien is extinguished.  *Id.* at

559.


MEMORANDUM OF DECISION − 11

Other courts have interpreted §1225(a)(5)(B) differently. *See In re Lairmore*, 101 B.R. 681, 684 (Bankr. E.D. Okla. 1988) ("the lien retention requirement of § 1225(a)(5)(B)(i) protects the secured claimant only until it receives the value of its allowed claim, [thus] the question becomes whether [bank] will have received the full value of its secured claim at the time it receives the second mortgage on the Duplex; i.e., on the effective date of the Plan.").

### b.  Practical Concerns and Ninth Circuit Guidance

This Court has practical concerns about the Second Circuit's approach in light of Debtors' Plan in this case.  First, it entirely shifts the risk to BOI to accomplish a sale of the Montpelier Ranch for a sum that will pay it in full, because under the terms of the Plan, BOI has no right to an unsecured claim for any deficiency.  Second, the removal of the liens on the Malta Ranch and the Personal Property Collateral gives Debtors a potential windfall at the expense of BOI.  This is because Debtors would then own the Malta Ranch and the Personal Property Collateral outright and free of the bank's lien, while BOI may end up with a shortfall because it is unable to sell the Montpelier Ranch for the full value of its allowed secured claim.  To protect itself, BOI deliberately cross-collateralized Debtors' property because Debtors fully financed the purchase of the Montpelier Ranch along with funds to make improvements.  The Plan would nullify that bargained-for protection.  Third, several courts have held that a debtor may not use confirmation to eliminate cross-collateralization absent the creditor's consent.  *In re Chickosky*, 498 B.R. 4, 18 (Bankr. D. Conn. 2013); *In re Heath*, 483 B.R. 708, 712–13

MEMORANDUM OF DECISION − 12

(Bankr. E.D. Ark. 2012) ("Indeed, the overwhelming majority of courts have refused to modify or alter the lien retained pursuant to § 1225(a)(5)(B)(i) in any way"); *In re Clark,* 288 B.R. 237, 249–51 (Bankr. D. Kan. 2003) (where the bank previously had a lien on both real estate and personalty, and the plan proposed for the bank to retain the lien only on real estate, the "treatment of the Bank's claim runs afoul of the lien retention requirement in § 1225(a)(5)(B).").

Finally, the Ninth Circuit has expressed reservations about "dirt for debt" plans, albeit in a different context. *Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)*, 85 F.3d 1415 (9th Cir. 1996) was a chapter 11 case. As such, in order to cram the plan down on the non-consenting creditor, the debtor had to prove, *inter alia,* that the plan was "fair and equitable," which in turn required the debtor to show that either the creditor would retain its lien and receive deferred cash payments with a present value at least equal to the claim, that the property securing the claim would be sold and the lien would attach to the proceeds of the sale, or that the creditor would realize the "indubitable equivalent" of its secured claim. § 1129(b)(2)(A). Those requirements, while similar, are not precisely what must be met under §1225(a)(5).

In *Arnold & Baker Farms,* the panel was asked to consider whether the debtors' plan, which called for distribution of part of the farmland that constituted the secured creditor's collateral, was the indubitable equivalent of its secured claim. In its opinion, the panel did not wholly foreclose the idea of payment of a creditor's secured debt through distribution of its real property collateral directly to it, but observed that "the

MEMORANDUM OF DECISION – 13

determination of whether a dirt for debt distribution provides a secured creditor with the indubitable equivalent of its secured claim must be made on a case-by-case basis . . . ." *Id.* at 1421. The determination in that case, as in the one before this Court, depends on valuation of the real property proposed to be returned to the creditor. In *Arnold & Baker Farms*, the valuation was particularly difficult because the appraisers disagreed about the highest and best use of the land, whether it be for development or agriculture. As such, there was a great disparity in the valuation per acre. The Ninth Circuit panel expressed concern about shifting that risk of valuation to the creditor.

In reaching its holding, the panel first acknowledged that the secured creditor in that case had bargained for the right to foreclose on all of the acreage that constituted its collateral in order to satisfy the indebtedness, just as BOI has done here when it deliberately cross-collateralized the line of credit with the Montpelier and Malta Ranches and the Personal Property Collateral. Debtors' Plan would strip BOI of that added security. Second, the panel noted that if the creditor ended up selling the property for less than the amount at which the property had been valued, it had no recourse to satisfy the deficiency, just as Debtors are proposing here, forcing the creditor to assume the risk of the sale. The panel observed, "to the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." *Id*. at 1422 (quoting *In re Keller*, 157 B.R. 680, 683–84 (Bankr. E.D. Wash. 1993)). The *Arnold & Baker Farms* panel concluded: "while we do not hold that the indubitable equivalent standard can never as a

MEMORANDUM OF DECISION − 14

matter of law be satisfied when a creditor receives less than the full amount of the

collateral originally bargained for, we do hold, as did the BAP, that the Arnold and Baker

plan does not provide [the creditor] with the indubitable equivalent of its secured claim as

required by the Bankruptcy Code." *Id*. at 1423–24.

Moreover, this Court is mindful of the guidance the Ninth Circuit also provided in

*In re Fobian*, 951 F.2d 1149 (9th Cir. 1991), *abrogated on other grounds by Travelers

Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 127 S. Ct. 1199, 167 L.

Ed. 2d 178 (2007), a chapter 12 case in which the debtor proposed a "dirt for debt" plan

involving an undersecured creditor.  In *Fobian*, the Ninth Circuit stated:

> cases have acknowledged the "theoretical possibility" of a surrender of
> property in satisfaction of a secured debt; however, such cases have also
> recognized that such a solution is unworkable in practical terms.  Absent
> the provision of some additional protection to the creditor, it is impossible
> to ensure that the creditor will receive the full amount to which it is
> entitled, and only that amount.  Surrender of the property may satisfy the
> secured claim.  However, if the value of the property is less than the
> amount of the claim, the creditor may retain an unsecured claim for the
> difference.  If the value of the property surrendered turns out to exceed the
> amount of the claim, the secured creditor receives a surplus to which it is
> not entitled.  Thus, the court in *In re Durr* rejected a plan which provided
> for the transfer of real property in satisfaction of a secured claim.
> The *Durr* court noted that a plan "proposing a payment with tangible
> property" must provide both for a "surplus of value" or for a "margin of
> allowance" to ensure that the creditor received full value, and for a means
> of recapturing excess value the creditor might realize on disposition of the
> collateral.  *In re Durr,* 78 B.R. 221, 225 (Bankr. D.S.D. 1987).  Because the
> plan at issue made no such provisions, it could not be confirmed.  *Id.; see
> also In re Indreland,* 77 B.R. 268, 274 (Bankr. D. Mont. 1987) (approving
> plan which provided for transfer of property to secured creditor where the
> debtor had submitted a 5 year plan, and the creditor could return to the
> court for "redetermination of its claim" if it failed to realize the value of its
> claim on sale of the collateral).

MEMORANDUM OF DECISION − 15

> In this case, the debtor's plan provides for neither the safeguards required
> by *Durr* nor the possibility of redetermination present in *Indreland.* While
> Section 1225(a)(5) would extinguish the Bank's claim to the extent it was
> secured, the unsecured portion would survive.

*Fobian*, 951 F.2d at 1152.

In sum, it appears this Circuit has reservations about the risks inherent in "dirt for debt" plans, but acknowledges that its applicability must be determined on a case-by-case basis. With respect to the Debtors' treatment of the lien retention clause of §1225(a)(5)(B)(i) in this case, the Court concludes that it ultimately need not reach the issue. As will be discussed below, there is a separate reason why Debtors' Plan may not be confirmed.

### 2. Value of the Montpelier Ranch

#### a. Appraisal Value

Much of the focus of the confirmation hearing concerned the appraisal value of the Montpelier Ranch, and it is clear the deciding factor in determining this value is how many acres are irrigable. Debtors contend the irrigation and terrain would support the growing of row crops on 800 acres of the land, although they have never irrigated that much of the property, and in fact have only ever grown crops on 377 acres, as they need the pastureland. Wayne Holland testified that the East side of the Montpelier Ranch waters itself from a big spring until late in the summer, which is 3/4 of the acreage. The rest can be surface irrigated from the end of April until November. There is some waste

MEMORANDUM OF DECISION − 16

acreage on the mountain side.  On the other hand, the county records indicate that the

Montpelier Ranch includes only 469 irrigated acres.

The appraisals line up on both sides.  BOI had appraisals done on the Montpelier

Ranch in 2015 and 2017, and both mimic the county records and list the irrigated acres at

469.  BOI had another appraisal done in December 2018, and the appraiser, Thomas

Stafford, asked Mr. Holland about the number of irrigated acres, and he provided the

2017 appraisal to him which indicated 469 irrigated acres.  Mr. Stafford inquired of Mr.

Holland whether anything had changed by way of land use since the 2017 appraisal, and

the Debtor indicated nothing was different.  Moreover, Mr. Holland did not accompany

Mr. Stafford during the appraisal on the Montpelier Ranch, and the property was covered

with snow at the time, so there was no opportunity to visually observe the presence of

irrigation ditches on the property or to have the irrigation systems explained.

Nevertheless, Mr. Stafford testified that the water rights were significantly more than

adequate to irrigate 469 acres.  He testified that the "best and highest use" is what he

appraises at, and on farm ground, the highest and best use is to maximize the use of the

water rights.  He admitted he could not tell from his inspection about the ability to use the

water to irrigate additional acreage, and did not consider all the acreage when it came to

the number of irrigated acres on the Montpelier Ranch.  His appraisal valued the

Montpelier Ranch at $3,600,000, but this did not include any value for the leases.  Mr.

Stafford testified that he agreed with the $41,250 valuation of the leases, as determined

MEMORANDUM OF DECISION − 17

by Debtors' appraiser in his report (*see* Ex. 102-4).  Thus, the fair market appraisal value

of the Montpelier Ranch from BOI's prospective is $3,641,250.  Dkt. No. 138 at ¶ 17.

Debtors had their own appraisal done in February 2019, and the appraiser, Mr.

Steinke, concluded the Montpelier Ranch included 878 acres of irrigable land.  Ex. 102-8.

This resulted in a fair market value of $4,350,000.  Ex. 102-1.  Like Mr. Stafford, when

Mr. Steinke visited the Montpelier Ranch, there was snow covering the ground and he

could not walk the acreage to look at the irrigation systems.  However, Mr. Steinke

performed a detailed analysis to locate the ditches and other irrigation equipment on the

property in order to determine how much of the property could be irrigated.

Mr. Steinke testified that the county conducts "mass appraisals."  He opined that if

the county appraiser visited the Montpelier Ranch and water rights were not being

utilized, then the potentially-irrigated acreage likely did not get counted.  Mr. Stafford

admittedly relied on the determination by the county appraiser.  Mr. Steinke, on the other

hand, created and included soil maps and topography maps, and generated a Google

Maps view of the Montpelier Ranch upon which he added handwritten indications of how

many acres could be irrigated based upon the presence of ditches, springs, streams, along

with the mainline and pivot.

The Court finds Mr. Steinke's appraisal to be more accurate than the Bank's in

terms of establishing the fair market value of the Montpelier Ranch.  Mr. Steinke's

appraisal was carefully done, and thoughtfully tailored to the specific terrain,

improvements, and conditions presented in establishing the acreage that *could be*

MEMORANDUM OF DECISION − 18

irrigated, should someone wish to do so. BOI's appraiser did a fairly cursory review, relying on past appraisals and the county records, without a deeper examination of the actual condition of the property. The Court's conclusion is bolstered by the fact that Mr. Holland testified the Montpelier Ranch had approximately 800 acres that could be irrigated, Mr. Stafford testified that there were more water rights on the property than necessary to water 469 acres, and Mr. Steinke performed a detailed extraction prior to concluding that the number of irrigated acres was 878. The foregoing inclines the Court to conclude that the number of irrigable acres is certainly higher than the 469 determined by the county and perpetuated by Mr. Stafford. As such, the fair market appraisal value of the Montpelier Ranch will be higher than the figure arrived at by Mr. Stafford and promoted by BOI. As the Court was presented with no other information from which it could reach a different conclusion, the Court finds that 878 acres of irrigated land is the more accurate figure.

Both appraisers agree that the value of the Montpelier Ranch is in the irrigated land. Moreover, the difference in the two appraisals is essentially the quantity of the irrigated acreage. As Mr. Stafford testified, if you swapped the irrigated acreage figure from Mr. Steinke's appraisal into his own appraisal, and added in value for the leases, the figures would be nearly identical. In other words, the difference in appraised values is attributable almost exclusively to the difference in irrigated acres. Thus, the Court finds $4,350,000 to be nearer the mark for an estimate of the Montpelier Ranch's fair market value.

MEMORANDUM OF DECISION − 19

b.  Liquidation Value

Confirmation of a chapter 12 plan requires the value, as of the effective date of the plan, of property to be distributed by the debtor under the plan on account of such claim to be not less than the allowed amount of such claim.  In considering the proposed chapter 12 Plan before it, the Court must determine what "value" it should apply at confirmation in this cramdown situation – fair market value, as discussed above, or liquidation value.  Section 506(a) provides that a secured creditor is secured to the extent of the value of the creditor's interest in the property, and unsecured to the extent that the value of the interest is less than the amount of the allowed claim.  The statute further provides, "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property …."  In other words, the value may be different depending on the context.  The Ninth Circuit Bankruptcy Appellate Panel addressed this issue, noting that the House Report regarding the drafting of § 506 stated:

> "Value" does not necessarily contemplate forced sale or liquidation
> value of the collateral; nor does it always imply a full going concern value.
> Courts will have to determine value on a case-by-case basis, taking into
> account the facts of each case and the competing interests in the case.

*In re Case,* 115 B.R. 666, 670 (9th Cir. BAP 1990) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 6312).  In similar fashion, the Senate Report stated that:

> While courts will have to determine value on a case-by-case basis, the
> subsection makes it clear that valuation is to be determined in light of the
> purpose of the valuation and the proposed disposition or use of the subject
> property. This determination shall be made in conjunction with any hearing

MEMORANDUM OF DECISION − 20

> on such disposition or use of property or on a plan affecting a creditor's interest. To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan.

*In re Case,* 115 B.R. at 670 (quoting Sen. R. No. 989, 95th Cong., 2d Sess. 68 (1978),

*reprinted in* U.S. Code Cong. & Admin. News 5787, 5854).

In interpreting these statements, the BAP concluded that valuation for the purposes of determining adequate protection may be different than for cramdown under § 1225.  *In re Case,* 115 B.R. at 670.  Specifically to the issue presented here, the panel wrote:

> If we were attempting to value [Farmers Home Administration's] interest in the property for adequate protection purposes, the possibility of forced liquidation would be assumed and a deduction for selling costs would be logical.  However, we conclude that for the purposes of § 1225(a)(5)(B)(ii) valuation, *when the debtor plans to retain the property*, selling costs should not be deducted from the fair market value of the property when valuing the creditor's interest in the property.

*Id.* (emphasis added); *see also In re Anderson,* 88 B.R. 877, 885 (Bankr. N.D. Ind. 1988) (in chapter 12 cases where property will be held as a going concern for the generation of farm income to pay debts, value should not be based on an orderly liquidation value); *In Re Robinson Ranch, Inc.,* 75 B.R. 606 (Bankr. D. Mont. 1987) (same).

Based upon the foregoing, and under the circumstances presented here, the Court concludes that Debtors may not utilize the fair market value for cramdown purposes when it proposes to distribute real property in the form of ranch acreage and buildings to its lending creditor in satisfaction of secured debt.  Under the facts of this case, "the possibility of forced liquidation would be assumed and a deduction for selling costs

MEMORANDUM OF DECISION − 21

would be logical." *See In re Case,* 115 B.R. at 670.  While the testimony established that BOI has accepted real property in exchange for debt in the past — in fact it owns a 1,200-acre potato ranch at the present time — the testimony established that BOI is not in the ranching, or potato growing, business.  It finances others who are.  Indeed, the potato farm is currently leased out and is for sale.  As such, when given "dirt for debt," BOI is likely to immediately attempt to sell it, or lease it out if it must.  BOI's employees who testified at the confirmation hearing all spoke in terms of liquidation of the Montpelier Ranch.  They also testified that prospective buyers understand that banks are not in the ranching business and do not want to own agricultural land and therefore need to sell it.  Because buyers are aware of this, banks tend to receive offers below appraised value.  BOI's chief credit officer, David Moe, testified that the bank could expect a twenty to twenty percent loss over fair market value because he believed that prospective buyers know the bank needs to sell.  Louis Blurton, a special assets manager at BOI, testified the bank may ultimately realize only 60-65% of the appraised fair market value for such a property, after deducting expenses.  In short, in this case, if Debtors wish to give BOI dirt for its debt, they must provide property, the *liquidation value* of which is not less than the amount of BOI's allowed secured claim.[5]

---

[5] In so holding, the Court acknowledges the Supreme Court's holding in *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 963, 117 S. Ct. 1879, 1885, 138 L. Ed. 2d 148 (1997), which differentiates between replacement value and foreclosure value under § 506, when the debtor chooses to retain and use collateral under § 1225(a)(5)(B) versus when the collateral is surrendered to the creditor under § 1225(a)(5)(C). The case at bar falls somewhere in between, as the Plan proposes a partial surrender in satisfaction of the debt.  As such, *Rash* is instructive, but not dispositive.

MEMORANDUM OF DECISION − 22

In estimating the liquidation value for use in analyzing Debtors' Plan under

§ 1225(a)(5), the Court is mindful that BOI might well receive less than full market value

for the Montpelier Ranch.  As noted above, the bank employees who testified gave

estimates that the number may be as much as twenty to forty percent below fair market

value.  However, the Court cannot utilize such speculative figures in its analysis.  Thus,

as will be discussed below, the Court will consider only those liquidation costs that are

virtually certain to occur.

### 3.  *Confirmation*

To be confirmable, the Plan must distribute to BOI at least the value of its allowed

secured claim.  Because it is a fully secured, and in fact oversecured, creditor, BOI is

entitled to not only its allowed secured claim, but interest, fees, and costs as well.

§506(b).  The Court finds the following costs will likely occur:

| | |
|---|---|
| $3,786,528.16 | (Loans + accrued interest as of the 10/27/18 petition date) |
| $142,535.52 | ($574.74 / day x 248 days (10/28/18 – 7/3/19)) |
| $16,682 | (attorney's fees and costs from 10/30/18 – 3/29/19 (Ex. 402)) |
| $261,000 | (realtor fees of 6% based on a sale at full fair market value) |
| $5,000 | (real estate taxes) |
| $4,211,745.68 | Total |

Furthermore, there would be additional costs for which the amount is less certain.

For example, closing costs such as title insurance and escrow fees, insurance, yearly

MEMORANDUM OF DECISION − 23

appraisals required by bank regulators, maintenance and upkeep costs, attorney's fees incurred after March 29, 2019 including the confirmation hearing and post-hearing briefing, and of course, interest accruing at the rate of $574.74 per day. Assuming BOI were able to sell the Montpelier Ranch *today* for the full fair market value price of $4,350,000, the Court finds there would be no more than an $138,254.40 equity cushion to support confirmation. However, based on the evidence presented, the Court is also cognizant that BOI is unlikely to be offered the full $4,350,000 for the property, given that buyers know the bank must sell. Moreover, the property cannot be sold today – Debtors have to move their things out of the house and turn over the property to BOI, only after which the bank may begin to market the Montpelier Ranch. Debtors had the ranch on the market for at least one year, and neither sold it nor received an offer near fair market value. All the while, interest is accruing. Indeed, assuming no additional costs or fees beyond those tallied above, the accruing interest alone would equal the equity cushion in only eight months.

In summary, the liquidation value of the Montpelier Ranch does not provide BOI with adequate value to support the satisfaction of its debt with the attendant interest, fees, and costs. As such, the Court cannot find that Debtors have met their burden to demonstrate that their proposed Plan will distribute to BOI property that is at least equal to the amount of its allowed secured claim. Accordingly, the Plan may not be confirmed.

MEMORANDUM OF DECISION – 24

### *Conclusion*

Because Bank of Idaho objected to Debtors' proposed chapter 12 Plan, section 1225(a)(5) of the Code requires Debtors to either surrender all of the collateral securing the bank's loans, or to distribute property to the bank that is not less than its allowed secured claim. Their Plan does not meet this standard, as Debtors do not propose to surrender all of BOI's collateral, and the liquidation value of the Montpelier Ranch is less than the amount of the bank's allowed secured claim. This is the case even though the Court finds the higher appraisal value to be more accurate. Accordingly, because § 1225(a(5)(B)(ii) has not been met, confirmation of Debtors' Plan will be denied by separate order.

Dated:  **July 03, 2019**

JOSEPH M. MEIER
CHIEF U.S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION – 25